The affidavit for the search warrant contains the following:

" * * * That in and upon certain premises in Justice Precinct No. 1, in the aforesaid County and State and more particularly described as follows, to-wit:

"(a) A. One Story Wooden Building, and being a residence, store and filling station combined, and all out building and premises appurtenant thereto."

The evidence shows, that the lot upon which the house was situated was 52 feet wide and 115 feet deep. Appellant testified that he did not rent any property 19 steps southeast, southwest, or south from his house, and exercised no control over that part of the premises. The officer who testified said that to the place where he found the beer in the container to which he testified on direct examination there was a trail which practically ended at the place where the beer was found. The term "premises," as it applies to a dwelling, is discussed in the case of Wolf v. State, 110 Tex. Cr. R. 124, 9 S.W.(2d) 350, and subsequently discussed in other opinions of this court. See Comeaux v. State, 118 Tex. Cr. R. 223, 42 S.W.(2d) 255; Dikes v. State, 120 Tex. Cr. R. 127, 48 S.W.(2d) 259.

Upon re-examination of the record, the opinion is entertained that the proper disposition of the appeal was made upon the original hearing.

The motion for rehearing is overruled.

## E. A. PIERCE & CO. v. ARONOFF.
### No. 2824.

Court of Civil Appeals of Texas. El Paso.
May 4, 1933.

Rehearing Denied June 8, 1933.

Philip I. Palmer and Martin B. Winfrey, both of Dallas, for appellant.

McCormick, Bromberg, Leftwich & Carrington, of Dallas, for appellee.

HIGGINS, Justice.

E. A. Pierce & Co. are brokers upon the New York stock exchange and have a branch office in the city of Dallas. E. O. Cartwright was connected with the Dallas office and represented Pierce & Co. in executing an order given by appellee, Aronoff, for the purchase of 200 shares of Fox Theatre "A" stock, out of which transaction the present controversy arose. For some time prior to such purchase Aronoff had been a customer of Pierce & Co., which held certain securities belonging to Aronoff to secure the payment of any indebtedness incurred by him. These securities were some Wheeling Steel bonds, 200 shares of Pierce Petroleum stock, 50 shares of American Sugar Refining Company stock, and 200 shares of Fox Theatre "A" stock. On January 7, 1929, Pierce & Co. purchased 200 shares more of Fox Theatre "A" stock, and charged the purchase price to Aronoff's account. Aronoff refused to accept the stock and pay therefor.

Prior thereto Aronoff, on June 28, 1928, had, in writing, agreed with Pierce & Co. that all transactions were subject to the rules, regulations, and customs of the exchange or market where executed, and that Pierce & Co., whenever deemed by it necessary for its protection, might sell any hypothecated securities without notice, in order to close out Aronoff's account.

This suit was brought by Aronoff against E. A. Pierce & Co., a partnership, and the individuals composing the same. Briefly stated the allegations of the petition are to the following effect:

On January 5, 1929, and for some months prior thereto, plaintiff was a customer of defendants, buying and selling various securities through them. On said date he had on deposit with defendants, as collateral to secure any balance which might be due by him to defendants, the Wheeling Steel bonds, American Sugar Refining Company stock, and 200 shares of Fox Theatre "A" stock, above mentioned, and on April 24, 1929, he also had on deposit the 200 shares of Pierce Petroleum stock above mentioned.

On or about the 7th or 8th of January, 1929, defendant, without authority from plaintiff, purchased and charged to his account 200 shares of Fox Theatre "A" stock, at $36.87½ per share, debiting defendant's account therefor with $7,405, which included $30 commission, and mailed a notice of such purchase to plaintiff, which he received January 14, 1929. On receipt of such notice plaintiff immediately notified defendants that he had not authorized such purchase and refused to accept the stock or ratify the charge against his account. Notwithstanding such notice defendants continued to maintain said debit of $7,405 against plaintiff and charged him interest thereon until April 23, 1929, when, without notice to or authorization from plaintiff, the defendants sold said 200 shares of Fox stock as on account of plaintiff for $29.12½ per share, crediting plaintiff's account with $5,787, and on April 24, 1929, sold plaintiff's Wheeling Steel bonds, crediting plaintiff's account with the proceeds thereof in the sum of $2,590.13, and on demand of plaintiff refused to surrender to him the above-mentioned American Sugar Refining stock, Pierce Petroleum Company stock, and the 200 shares of Fox Theatre "A" stock, which latter stock was purchased by plaintiff on December 31, 1928, and on January 5, 1929, unless and until plaintiff would pay to defendants the sum of $4,588.84 claimed by defendants as the balance due by plaintiff. Said balance included the purchase price of the 200 shares of Fox Theatre "A" stock wrongfully purchased for plaintiff's account on January 8, 1929, plus the commission and interest to April 24, 1929.

On April 24th, when defendants demanded payment of said $4,588.84, and on April 25, 1929, when plaintiff paid said sum to defendants, his true indebtedness to defendants did not exceed $2,572.94, but, because of the then threatened sale by defendants of plaintiff's securities above mentioned, plaintiff was compelled to and did on April 25, 1929, pay, under protest, said $4,588.84 in order to secure delivery to him of his remaining stock in the hands of defendant and belonging to him.

Plaintiff never at any time ordered, claimed, or authorized the purchase or sale of the disputed 200 shares of Fox Theatre "A" stock. Plaintiff did not at any time authorize or become liable to incur sale by defendants of his Wheeling Steel bonds in liquidation of his indebtedness to defendants.

Plaintiff set up further that, because of the unauthorized and unlawful acts and conversion of his property by defendants and extortion from him of said excess payment, made because of the duress on his property, and threatened sale thereof, he had been damaged in the sum of $2,133.38. This sum is composed of the following items: $198.03, representing interest charged on the debit item of $7,405; the sum of $1,618 representing the difference between the debit item of $7,405 and the credit item of $5,787; the sum of $199.87, representing the difference between the sale price of the Wheeling Steel bonds, which sale price was $2,590.12, and

the sum of $2,790, the value of said bonds, at the date of the alleged conversion thereof; and the sum of $117.48, interest on said amounts.

The prayer was for judgment for the plaintiff's damages as above indicated.

Defendants answered by general denial and special plea setting up the following: The agreement of June 28, 1928, above mentioned. Subsequent to January 8, 1929, plaintiff confirmed the purchase of the 200 shares of Fox Theatre "A" stock which he complained of and thereafter closed out his account and authorized defendants to do the things complained of. That he authorized one Lomax to act as his agent to close out his account and paid defendants the sum of $4,588.84 to cover the balance due defendants, and requested defendants to have issued in plaintiff's name, and forwarded to the Republic National Bank at Dallas, the 50 shares of American Sugar Refining stock, 200 shares of Fox Theatre "A" stock, and 200 shares of Pierce Petroleum. Plaintiff authorized the sale complained of through his agent Lomax and confirmed the acts of his agent at the time the same was made. Defendants relied upon the act of said agent in closing out plaintiff's account and on the acts and instructions of plaintiff in ordering the sale made, and plaintiff at all times recognized the validity of said transactions. That on or about January 8, 1929, plaintiff called defendants and placed an open order to purchase for his account 200 shares of Fox Theatre "A" stock, which order was executed in accordance with the agreement between them and in accordance with the universal and notorious custom among brokers in Dallas, New York City, and elsewhere. Defendants used all the care and diligence required of them, and executed the order in the usual and customary way. Plaintiff was experienced in trading stocks, and knew, or should have known, the universal and notorious custom and manner of handling the purchase and sale of stocks, and knew the order would be executed in the manner it was executed, and knew the account would be handled in accordance with the custom among brokers at the points mentioned. After the stock had been purchased plaintiff told defendants the same should not be charged to his account; that he had ordered it purchased for one Paul Berwald. Defendants informed plaintiff the stock had been purchased in accordance with the universal custom existing among brokers, and plaintiff agreed to keep the stock and put up any additional margin defendants might require.

Thereafter plaintiff sent Lomax, his agent, to defendants to close out his account, pay whatever balance was necessary, have certain stocks issued to plaintiff and sent to him in care of the Republic National Bank. Lomax issued instructions to close out the account, ordered the sale of certain stocks in connection therewith, which instructions were confirmed by plaintiff at the time, and plaintiff accepted delivery of the stock in accordance with his instructions. Other allegations in the answer need not be noticed, as no point in connection therewith is here presented.

The evidence discloses that the order for the 200 shares of the disputed Fox Theatre "A" stock was given by Aronoff on January 5, 1929, which was Saturday, and too late to execute the commission in New York City on that date, but that the purchase was consummated on the following Monday.

The case was submitted upon special issues which, with the answers returned, are as follows:

"Special Issue No. 1.

"Was there an understanding between plaintiff and defendants' agent, Cartwright, by their telephone conversation on January 5, 1929, for said Cartwright to purchase the 200 shares of Fox Theatre A stock in controversy for the account of plaintiff?

"Answer 'Yes' or 'No.'

"Answer: 'No.'

"You are instructed in connection with the foregoing special issue No. 1, that if such an understanding of purchase was had as is referred to in the preceding issue, the same would be chargeable to the account of plaintiff even though plaintiff, Aronoff, stated in substance to Cartwright that he was purchasing said stock for Paul Berwald.

"Special Issue No. 2.

"Did the plaintiff tell any representative of defendants that he would accept the 200 shares of Fox Theatre 'A' stock after said stock had been purchased?

"Answer 'Yes' or 'No.'

"Answer: 'No.'

"Special Issue No. 3.

"Did the plaintiff authorize John A. Lomax to act in his behalf in closing out his account with the defendants on April 23, 1929, including the 200 shares of Fox Theatre A stock in controversy?

"Answer 'Yes' or 'No.'

"Answer: 'No.'

"Special Issue No. 4.

"Did John A. Lomax on or about April 23, 1929, tell the representatives of the defendant to sell the 200 shares of Fox Theatre A stock in controversy for the account of plaintiff, Aronoff?

"Answer 'Yes' or 'No.'

"Answer: 'No.' "

Issue No. 5 was submitted conditionally and was not answered.

"Special Issue No. 6.

"Do you find and believe from a preponderance of the evidence that the plaintiff, through the Republic Bank & Trust Company, paid to the defendant the sum of money included in its check to the defendant of $4,588.84, representing the difference between the purchase and sale prices, the commission and interest charges on the disputed 200 shares of Fox Theatre A stock, included as debits in the defendant's final statement of plaintiff's account, solely to avoid a threatened sale by the defendants and to thereby procure the delivery to himself, otherwise refused by the defendant, of the 200 Pierce Petroleum, 50 American Sugar and the other undisputed 200 shares of Fox Theatre A stocks owned by plaintiff but held and claimed as collateral to his account by defendant?

"Answer 'Yes' or 'No.'

"Answer: 'Yes.'"

Judgment was rendered in favor of the plaintiff for $1,811.63, with interest from April 25, 1929.

Upon the trial no evidence was offered as to the value of the Wheeling Steel bonds alleged to have been converted by defendants, and no issue was submitted with respect to such alleged conversion. The jury findings and recitals in the judgment disclose that the judgment is based on the protested excess payment on account of the difference in the purchase price and the sale price of the disputed 200 shares of Fox Theatre "A" stock, plus the commission and interest charged thereon against the plaintiff's account.

Appellants first complain of the refusal of a peremptory instruction in their favor. It is asserted such instruction should have been given:

First, because Aronoff had agreed that all transactions should be subject to the rules, regulations, and customs of the exchange or market where the order was to be executed, and the order of January 5th for the 200 shares of Fox Theatre stock is conclusively shown to have been executed in accordance with such rules, regulations, and customs.

Second, because the undisputed evidence shows the order given was not in plain and unequivocal terms, but was susceptible of different interpretations, and defendants were thereby misled and acted in accordance with their interpretation.

The order was given by Aronoff to Cartwright over the telephone.

Aronoff testified:

"I told Mr. Cartwright that Mr. Berwald wants you to buy him two hundred shares of Fox Theater stock and when I gave the order Cartwright says, 'Okay'; * * * he says, 'by the way, is Mr. Berwald going to Chicago with you?' I says, 'Yes.' He says, 'Who is going to take care of the payment of his stock?' I says, 'I will ask him.' He says, 'I wish you would find out and let me know.' I says, 'all right.' He says, 'by the way, I don't believe I will be able to purchase this stock today because the curb closes, there is an hour difference in time here and New York and I think it's closed about twelve o'clock New York time and eleven o'clock our time.' So I called Mr. Berwald immediately and told him it was too late.

"Q. You called Mr. Berwald? A. Yes, I got the girl to get him and I called up and told him I didn't place the order because it was too late to place the order.

"Q. What did he say then? A. He didn't say anything except said he would take care of it himself."

Aronoff's version of the language of his order is corroborated by the witnesses Malowitz and Hillmond.

Cartwright testified: "Mr. Aronoff called me and told me that he wanted to buy two hundred shares of Fox Theatre Class 'A' stock, which was listed on the New York Curb Exchange, and he told me he wanted to buy it at the market. And that was late in the day, it was too late to execute the order, although I think the market had about a minute or more to run, or some such small time. I told him it would be impossible to buy it that day, but told him we would buy it Monday morning which he said was all right. In the course of the conversation he mentioned that he was buying that stock for a friend of his, I believe Paul Berwald, and of course, that had nothing to do with the order he gave me."

There is testimony corroborating Cartwright's version of the order as given by Aronoff.

The testimony quoted raised a clear issue of fact as to what was said by Aronoff in ordering the purchase of the stock.

If the conversation was as he states it, then Cartwright was not authorized to purchase the stock for Aronoff's account and charge the purchase price and commission to him. It authorized the purchase for Berwald's account and required defendants to look to Berwald for the purchase price. The order was executed in New York, and no rule, regulation, or custom of that exchange or market is shown which would authorize defendants to purchase in Aronoff's name and charge him therefor if the conversation was as stated by Aronoff. The issue of fact was resolved against defendants by the first finding.

There was no ambiguity in the order as given by Aronoff, and defendants could not have been misled.

It follows the reasons assigned in sup-

port of the peremptory charge are not well taken.

■■ It is complained of the first issue that it "places too great a burden upon the defendants."

No charge upon the burden of proof was given, and the issue as submitted did not impose the burden upon either party.

It is undisputed that Cartwright made the purchase for the account of plaintiff and charged him therefor. Defendants had no right to do so unless Cartwright was so authorized by the plaintiff.

It was therefore necessary to determine whether the agreement between the parties as evidenced by the conversation authorized the action taken in making the purchase for the account of plaintiff.

Issue No. 1 may not have aptly submitted this primary controlling issue of fact between the parties, but we do not regard it as subject to the objection stated.

■■■ Error is assigned to the refusal of defendant's requested issues 1 and 6, and charge No. A, which read:

"1: Did the plaintiff on January 5, 1929, tell E. O. Cartwright to buy 200 shares of Fox Theatre 'A' stock?"

"6: Did the plaintiff give to E. O. Cartwright an open order to purchase 200 shares of Fox Theatre 'A' stock?"

"A: Gentlemen of the Jury: You are instructed by the term 'open order' as used in connection with the purchase and sale of stocks is meant an order to purchase stock which the party ordering its purchase does not limit the broker as to the day upon which said order may be executed."

It was undisputed that plaintiff told Cartwright to buy the stock. It is not necessary to submit undisputed issues, for which reason the first issue was properly refused.

The evidence raises the issue of whether the order was an open one or limited in its execution to January 5th, but it is immaterial, for the plaintiff's pleading tendered no issue in that respect, nor is the judgment based upon any such issue. Whether the order was or was not an open one would not justify defendants in making the purchase for plaintiff's account when the commission given was to purchase for Berwald's account.

■■ By the fifth proposition it is asserted that issues 1 and 6 are duplicitous.

Judge Speer, in his Law of Special Issues, says:

"The forbidden grouping of issues pertains only to controlling issues, which in the nature of things should be separately submitted. There is no duplicity where a single ultimate issue is submitted even though there is combined with it an immaterial matter, such as an evidentiary issue. The purpose of the rule is to promote definiteness and avoid ambiguity on the finding." Section 185.

"It does not follow, however, that there cannot be a grouping of facts in a single interrogatory. On the contrary, it frequently happens that the ultimate fact issue being submitted is made up of more than a single fact element, sometimes of a group of facts or fact elements, without the concurrence of all of such facts the controlling fact issue would be incomplete and a finding thereon meaningless in law. So that, a proper grouping of facts as herein contradistinguished from issues, is not only allowable, but oftentimes is permissible and even indispensable. This is the essential doctrine of completeness." Section 187.

"If separateness of issues is essential in the submission, equally so is completeness of each issue essential. Nothing short of the whole fact or group of facts constituting the issue will serve the ends of the law for without this there is no ultimate fact invoking the law. Such completeness should be found in the one issue and not in the aggregate of issues." Section 190.

Under the rule so well stated by Judge Speer the objection urged is not well taken.

■■ Nor do we regard as tenable the objection that issues 3 and 6 are objectionable as being upon the weight of the evidence.

Affirmed.

### On Rehearing.

■ In their motion for rehearing appellants complain of the judgment allowing interest from April 25, 1929, asserting that such allowance is contrary to the rule announced in Atkinson v. Jackson Bros. (Tex. Civ. App.) 259 S. W. 280.

In the present case interest from the date stated was prayed for by plaintiff. The court did not submit to the jury the amount of the damages to be awarded, but merely submitted the facts from which the court could ascertain and estimate the damages. In cases so submitted, interest as a part of the damages is rightfully assessed, if prayed for. City of San Antonio v. Pfeiffer (Tex. Civ. App.) 216 S. W. 207; Texas & P. Ry. Co. v. Erwin (Tex. Civ. App.) 180 S. W. 662.

This rule is expressly recognized as correct in the case cited by appellants.

In their motion, appellants also vigorously attack the sufficiency of the evidence to support the finding upon the first issue submitted. They quote, in this connection, portions of the testimony of Aronoff.

The testimony quoted in the opinion raised the issue first submitted.

The testimony quoted in the motion was all a matter for the consideration of the jury in determining such issue.

Other questions presented in the motion have been considered and call for no discussion. Upon the record here presented we think no reversible error is shown, and the motion should be overruled.

It is so ordered.